J-A05043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TEAL PATRICE RISHEL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDRE DASHAWN FULLER | : | |
| | : | |
| Appellant | : | No. 1184 MDA 2021 |

Appeal from the Order Entered August 2, 2021
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2019-11235

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED MARCH 09, 2022**

Andre Dashawn Fuller ("Father") appeals *pro se* from the August 2,
2021, order entered in the Court of Common Pleas of Luzerne County, which
denied his petition for modification of an existing custody order to provide him
with monthly video visits or telephone calls with his minor son, E.F., while
Father is incarcerated.[1]  After a careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] This Court has noted that the current version of the Custody Act does not
contain a provision for an award of "visitation."  **See S.T. v. R.W.**, 192 A.3d
1155, 1165 (Pa.Super. 2018).  In **S.T.**, **supra**, we held that an incarcerated
parent's request for the right to contact his or her child via telephone is to be
construed as a request seeking "supervised physical custody" requiring the
trial court's consideration of the factors set forth in 23 Pa.C.S.A. § 5328(a).
**Id.** at 1165.  Here, as discussed *infra*, the trial court undertook an extensive
assessment of these statutory factors.

The relevant facts and procedural history are as follows: On September 10, 2019, Teal Patrice Rishel ("Mother") filed a complaint in custody seeking sole physical and legal custody of E.F., who was born in April of 2013. Mother averred she and Father were never married, and E.F. has always resided with her. She also averred:

> [Father] is violent, vindictive, and abusive and had been incarcerated during the life of [E.F.] and is currently incarcerated again. [Father] is physically abusive, verbally abusive, and violent towards [E.F.], and [Mother] fears for [E.F.'s] safety as well as her own.

Mother's Custody Complaint, filed 9/10/19, at ¶ 6.

Mother attached to her complaint a criminal record/abuse verification form indicating she has had no criminal convictions or juvenile adjudications of delinquency for a variety of listed crimes, including the manufacture, sale, delivery, or possession of a controlled substance or other drug or device.

On October 21, 2019, the matter proceeded to a hearing before a conference officer, and on October 28, 2019, the conference officer entered an order granting Mother sole legal and physical custody of E.F.

On February 24, 2020, Father filed a petition for modification of the custody order wherein he sought video visits or telephone calls with E.F.[2]

---

[2] Although Father's petition was time-stamped and docketed on March 4, 2020, we shall deem it to have been filed on February 24, 2020, when it was handed to prison authorities. *See Commonwealth v. Castro*, 766 A.2d 1283 (Pa.Super. 2001) (holding document deemed filed by prisoner when delivered to prison authorities for mailing).

Father attached to his petition a criminal record/abuse verification form indicating he was in jail for a 2013 conviction related to the manufacture, sale, delivery, or possession of a controlled substance or other drug or device, and, additionally, he had charges pending against him related to making terroristic threats, 18 Pa.C.S.A. § 2706. He averred Mother had been previously arrested for possession of a controlled substance.

On November 18, 2020, the conference officer held a hearing, and on January 22, 2021, the conference officer filed a recommendation and interim order denying Father's petition for modification of the custody order. Father filed exceptions at which point the conference officer discovered the November 18, 2020, hearing had not been recorded due to faulty equipment. Thus, the trial court remanded the matter for a new hearing, which was held before the conference officer on May 25, 2021.

Mother and Father appeared *pro se* at the May 25, 2021, hearing. Father testified he is the biological father of E.F., and he is currently incarcerated at SCI Benner Township. N.T., 5/25/21, at 5. Father asserted he was seeking monthly video visits or telephone calls with E.F. *Id.* at 5-6.

Father testified he loves E.F., and he has been "kind of depressed not being able to hear from [E.F.]." *Id.* at 7. Father testified he was incarcerated for six years at SCI Frackville, and during this time, he spoke to E.F. on the telephone "regularly" and sent him birthday cards. *Id.* at 8. He indicated that, during this time of incarceration, he and Mother had "a good relationship,"

and she brought E.F. to the prison "monthly" to visit Father. *Id.* at 6, 8. However, Father indicated that, at some point during his incarceration, he agreed to a protection from abuse ("PFA") no-contact order as to Mother. *Id.* at 8-9. The PFA order does not expire until October of 2023. *Id.* at 9.

On August 27, 2019, Father was released on parole from SCI Frackville; however, he was reincarcerated on September 2, 2019. *Id.* at 8. Father testified that during his week on parole he took E.F. to Chuck E. Cheese and a festival. *Id.* at 7. He explained he was arrested for making terroristic threats on September 2, 2019, after he tried to take E.F. to a family cookout in New Jersey, but Mother refused to release E.F. into his custody. *Id.*

Father testified the last time he had contact with E.F. was on September 1, 2019, prior to his most recent reincarceration. *Id.* Father acknowledged he has taken no steps to modify the PFA order to provide for him to have contact with Mother as it relates to E.F. *Id.* at 9. Father proposed that the conference officer issue an order directing a three-way conference call whereby his mother (E.F.'s paternal grandmother) would be the connection between Father and E.F. *Id.* at 10.

Father testified his parole was revoked after his September 2, 2019, arrest, and he is expecting a parole hearing in the next six months. *Id.* at 11. He noted that his terroristic threats case is still pending. *Id.* However, he is hoping to be released from prison in 2024. *Id.*

Mother testified there is a lot of history between her and Father. *Id.* She indicated she does not believe the prison will permit a three-way conference call, so that is not a viable option. *Id.* at 11-12. Mother testified she refused to allow E.F. to travel to New Jersey with Father on September 1, 2019, because Father was on parole. *Id.* at 12. She indicated Father was "trying to take [E.F.] along while he violated parole. So, that is very irresponsible as a parent in my opinion." *Id.*

Mother testified Father does not have her home address per the PFA order, so he sends letters addressed to E.F. to maternal grandmother's residence. *Id.* She testified that in a recent letter Father made statements to E.F. insinuating Mother does not protect E.F., and, thus, he would not be surprised to learn that E.F. has had the COVID-19 virus. *Id.* Mother testified E.F. has never tested positive for the virus. *Id.* She also noted Father made comments in the letter suggesting Mother is not a good parent because she insists that E.F. wears eyeglasses. *Id.* at 13. Mother testified she makes E.F. wear eyeglasses because "he needs glasses." *Id.* She indicated "I took him for glasses as any good parent would because he couldn't see…[and] was complaining of headaches." *Id.*

Mother testified that during Father's six years of incarceration she gave Father "multiple opportunities to be the father that [E.F.] deserves to have in his life from phone calls to visits." *Id.* She indicated she tried to help them build a relationship, but Father kept focusing on her. *Id.* For instance, if she

put E.F. on the telephone, Father would "say a few words to [E.F.] and then tell him to give the phone back to me even though I expressed I was only answering the phone so he [could] speak to [E.F.], not me." *Id.*

Mother testified that during some of the telephone conversations Father would speak negatively about her to E.F. *Id.* Father blamed Mother for the fact he was in prison, and he told E.F. that when he got out of prison E.F. would be living with him. *Id.* Mother noted Father made these comments without having any home plan, job ideas, or stability to provide for E.F. *Id.* at 14.

Mother testified she took E.F. to visit Father while he was in prison at SCI Frackville before he was released on parole, and she clarified the only reason she did so was for E.F. and Father to build a bond. *Id.* However, Mother testified that, instead of focusing on E.F., Father focused on her. *Id.* She testified Father paid "very minimal attention to [E.F.]" and spent the visit mainly trying to touch Mother inappropriately. *Id.*

Mother acknowledged she took E.F. to the festival in Scranton when Father was on parole in 2019 so that Father could see E.F. *Id.* She indicated Father arrived at the festival during the middle of the afternoon and came with one of his friends, who was visibly intoxicated. *Id.* Father wanted his friend to walk around the festival with E.F. while Father talked to Mother; however, Mother would not allow this to occur, which visibly upset Father. *Id.* Mother testified Father then called her inappropriate names in front of E.F. *Id.*

Mother testified Father surrounds himself with "gang members," and he says he is the "gang leader." *Id.* Mother confirmed Father took a parenting class while he was in prison; however, she testified that, judging by Father's actions while he was on parole, he did not learn anything from the class. *Id.* at 15. Mother testified Father has poor judgment as to the boundaries between an adult conversation and a child being present during the conversation. *Id.*

Mother testified she has a full-time job, takes good care of E.F., and provides for everything he needs financially. *Id.* She confirmed Father has had no contact with E.F. since September of 2019. *Id.* She requested the conference officer deny Father's request for video visits or telephone calls because Father speaks inappropriately about her to E.F. and confuses E.F. *Id.* She noted that, since Father's arrest on September 2, 2019, she has not afforded Father the opportunity to speak to E.F. because Father made threats directly towards Mother and her loved ones. *Id.* at 16.

Mother testified E.F. knows that Father is his biological father, and he is in prison. *Id.* She indicated E.F. does not express any interest in speaking to Father, and E.F. is not missing anything from not having a relationship with Father as he has a different stable father figure in his life. *Id.*

Mother testified E.F. has no contact with his paternal grandmother or aunt because when Father was arrested on September 2, 2019, paternal grandmother blamed Mother while paternal aunt threatened to have a physical

altercation with Mother for calling the police. *Id.* at 17. Mother testified she has not permitted E.F. to have contact with his paternal grandmother or aunt because she believes they will poison E.F. against her and convince him "Father has done nothing wrong." *Id.* Mother testified she is trying to raise a respectful child, and Father's family is not acting accordingly. *Id.*

Father cross-examined Mother and asked her whether he has ever been physically abusive or violent towards E.F. *Id.* at 19. Mother responded that, while she was pregnant with E.F., Father threw her onto a bed with such force that the bed broke, and Father stated he did not care if the child died. *Id.* at 18-19. She testified that, in her mind, that constituted physical violence towards E.F. *Id.* at 19. She noted that Father has not had many opportunities to show his physically violent side towards E.F. because he has been in prison for most of E.F.'s life. *Id.* at 19-20.

Father asked Mother why it would be confusing for E.F. to have contact with him. Mother explained that it would be confusing and detrimental for E.F. to have contact with Father because Father neither knows how to have a relationship with a child nor speak to E.F. like a father. *Id.* Mother testified she expects E.F. to grow up and be a good father someday, and Father is not able to show E.F. the necessary qualities. *Id.* at 20.

Father asked Mother why, if she had a problem with E.F. being around his intoxicated friend at the festival, she permitted E.F. to go on a trip to New York with maternal grandmother, who is a heroin addict. *Id.* at 21. Mother

testified that maternal grandmother is a recovering addict; however, she was not under the influence of drugs when she took E.F. to New York to visit maternal aunt. *Id.* Mother confirmed she viewed maternal grandmother before she left for the trip, and she was "100 percent sure" maternal grandmother was not under the influence. *Id.* at 21-22. Mother noted several other family members, none of whom use drugs, were present during the four-day vacation, and Mother was "very certain that [E.F.] was completely safe." *Id.*

Father asked Mother whether she is a gang member. Mother testified she is not, and never has been, a member of a gang. *Id.* at 22. She admitted that, when she was sixteen years old, she had friends who were affiliated with a gang; however, aside from Father, she has spent no time with any gang affiliated people since well before the time E.F. was born. *Id.*

The following relevant exchange then occurred:

> [FATHER]: And, one last question. You said that I violated my parole by going to New Jersey to see my family; but, you and your boyfriend had a firearm that was inside of your house that you said was in a safe.
>
> [MOTHER]: What is your question?
>
> [FATHER]: Did you own—do you or your boyfriend own a firearm that you stated was in a safe at your house in a safe spot?
>
> THE COURT: Okay, sir. I'm going to ask you for a timeframe. When are we speaking of?
>
> [FATHER]: August 27th of 2019 and between—and between the time I got arrested.
>
> THE COURT: Okay. So, sir, I'm going to ask you this question. You're requesting to have a monthly contact with your

son, [E.F.] What does this question have to do with your request here today?

[FATHER]: Because she stated that I was violating my parole by doing this; but she, herself, was on probation—on parole for possession of a controlled substance; but, that is a violation of her conditions of parole to be around firearms, alcohol, or any other type of things like that.

So, by her having this firearm in her apartment knowing that violates her parole and her probation, so by her trying to say that I was violating my parole by going to see my parents in another state, I believe that would, you know, show that she's trying to be vindictive of trying to bring up reasons to not allow me to talk to [E.F.] on her own—

THE COURT: Here's the thing, sir. I will tell you this. I mean, all of this information, all the testimony being given to me, is something I'm going to take into consideration and give the appropriate weight to when it comes to who is on parole and who was on probation; and, if there were any possible violations of those, I mean, those aren't really the crux as to why we're here today.

We're here today to determine if it's in the child's best interest to begin the video contact. I understand there is a history here, and we can go back a long ways [*sic]* and say he said/she said; but, I can tell you, sir, that when it comes to Mom's testimony that you made a decision to apparently leave, a violation of your obligations, that is not really the crux of why we're here.

*Id.* at 22-24.

The conference officer asked Mother whether E.F. was in counseling, and she indicated that he was not in counseling but that she would be "open" to placing him in counseling. *Id.* at 25. She also indicated that, if a counselor spoke with E.F. and determined it would be in his best interest to have telephone calls or video visits with Father, she would take it into consideration. *Id.* She noted she wants "to do whatever is right for [E.F.]." *Id.* at 25-26.

- 10 -

She indicated she wanted E.F. to have a relationship with Father; however, Father kept saying inappropriate things to E.F. such that she concluded it was not in E.F.'s best interest. *Id.*

On June 9, 2021, the conference officer denied Father's petition for modification of the custody order in the form of video visits or telephone calls, and Father filed a timely exception to the trial court. On August 2, 2021, the trial court held a hearing on the matter, and on that same date, the trial court dismissed Father's exceptions.

Father filed a timely *pro se* notice of appeal. He failed to file a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b); however, after the trial court directed Father to file a Rule 1925(b) statement, Father did so.[3] The trial

---

[3] We note the trial court filed its Rule 1925(b) order on September 9, 2021. Therein, the trial court indicated Appellant was required to file his Rule 1925(b) statement within thirty days from the date the order was filed. Although Father's Rule 1925(b) statement was time-stamped and docketed on October 19, 2021, we shall deem it to have been filed on October 4, 2021, when it was handed to prison authorities. *See Castro*, *supra*.

    As Father complied with the trial court's order to file the Rule 1925(b) statement by October 9, 2021, and there is no assertion of prejudice, we overlook any defect. *See In re K.T.E.L.*, 983 A.2d 745 (Pa.Super. 2009) (holding the failure to file a 1925(b) concomitantly with a children's fast track appeal is considered a defective notice of appeal and will not be dismissed since failure to file the statement is a violation of a procedural rule and not an order of court).

court filed a Pa.R.A.P. 1925(a) opinion on October 5, 2021, wherein it set forth its specific analysis of the sixteen factors set forth in 23 Pa.C.S.A. § 5328(a).

On appeal, Father contends the trial court erred in denying his petition for modification of custody to allow for him to visit monthly with E.F. via video or telephone. Specifically, Father contends the trial court failed to consider Mother intentionally lied about Father being physically abusive towards E.F., as well as about her conviction for possession of a controlled substance. Father contends that, in light of Mother's intentional falsehoods, the trial court erred in deeming her testimony to be credible.

Initially, we note that "[w]e review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad." **S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa.Super. 2014). We will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." **In re K.D.**, 144 A.3d 145, 151 (Pa.Super. 2016) (citation omitted). Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." **Id.**

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest

- 12 -

of the child was careful and thorough, and we are unable to find any abuse of discretion.

***R.M.G., Jr., v. F.M.G.***, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quotations omitted). The test is whether the evidence of record supports the trial court's conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa.Super. 2006).

It is well settled that "[t]he paramount concern in child custody cases is the best interests of the child." ***C.G. v. J.H.***, 648 Pa. 418, 193 A.3d 891, 909 (2018). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." ***M.J.N. v. J.K.***, 169 A.3d 108, 112 (Pa.Super. 2017).

This case is governed by the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340, which became effective on January 24, 2011. The Act enumerates the following types of custody awards that a court may order:

> **(a) Types of award. —** After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:
>
> **(1)** Shared physical custody.
>
> **(2)** Primary physical custody.
>
> **(3)** Partial physical custody.
>
> **(4)** Sole physical custody.
>
> **(5)** Supervised physical custody.
>
> **(6)** Shared legal custody.
>
> **(7)** Sole legal custody.

23 Pa.C.S.A. § 5323(a) (bold in original).

- 13 -

Instantly, as indicated *supra*, we deem Father's request in his petition for modification as a request for "supervised physical custody." ***S.T. v. R.W.***, 192 A.3d 1155, 1165 (Pa.Super. 2018) (footnote omitted) ("[I]ncarcerated parents who seek some form of contact with their children—whether it be a request that the children visit them or otherwise—are seeking an award of 'supervised physical custody' as defined under § 5323.").

The trial court was required to consider the following enumerated list of factors in determining E.F.'s best interests related to Father's request for supervised physical custody at SCI Benner Township, where he is currently incarcerated:

> **(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.

- 14 -

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Further, we note that in deciding custody cases where a parent is incarcerated, this Court has stated that the factors delineated in ***Etter v. Rose***, 684 A.2d 1092 (Pa.Super. 1996), which was decided prior to the effective date of the Act, "are now assimilated into § 5328(a) analysis under § 5328(a)(16)." ***S.T.***, 192 A.3d at 1167 (citations omitted). Those factors include:

(1) age of the child;

(2) distance and hardship to the child in traveling to the visitation site;

- 15 -

(3) the type of supervision at the visit;

(4) identification of the person(s) transporting the child and by what means;

(5) the effect on the child both physically and emotionally;

(6) whether the parent has and does exhibit a genuine interest in the child; and

(7) whether reasonable contacts were maintained in the past.

*S.T.*, 192 A.3d at 1167 (quoting *M.G. v. L.D.*, 155 A.3d 1083, 1094 (Pa.Super. 2017)) (citation omitted).

In *S.T.*, *supra*, we also noted that our Supreme Court included another relevant consideration, namely:

> (8) the nature of the criminal conduct that culminated in the parent's incarceration, regardless of whether that incarceration is the result of a crime enumerated in [section 5329(b)].
>
> *M.G. v. L.D.*, 155 A.3d at 1094[.] Although *Etter* was decided prior to the amendments to our current Custody Law, in *M.G.* we determined they still played a role in deciding prison cases.

*S.T.*, 192 A.3d at 1167.

In the case *sub judice*, in its opinion, the trial court initially recognized E.F.'s age, noted the difficulties related to E.F. speaking to Father due to the PFA order, recognized the type of communication Father was seeking, and recognized the contacts Father had in the past with E.F. *See* Trial Court Opinion, filed 10/5/21, at 1-2. The trial court noted it found "the testimony presented by Mother to be credible and did not find the Father credible." Trial Court Opinion, filed 10/5/21, at 2. The trial court then assessed the Section 5328(a) factors as follows:

- 16 -

**1. Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.**

This factor is in favor of Mother. Mother has encouraged contact because she met with Father in prison with E.F., as well as telephone and video calls. Father is currently incarcerated until 2024. Mother is open to taking E.F. to professional counseling for talking with Father. Mother is willing to then take a second look at Father's contact with E.F. Further, there has been no testimony regarding Father as it relates to this factor, as he has been incarcerated since E.F. was born.

**2. The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**

This factor is in favor of Mother. Father was reincarcerated [in] 2019 due to terroristic threats on Mother's life and the life of others around Mother. When Mother was pregnant, Father threw her on the bed, [broke] the bed, [and said] he did not care if Mother or child died. Mother has since obtained a PFA order against Father. There has been no testimony regarding abuse committed by either party against E.F.

**(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).**

Not applicable. There has been no testimony of abuse from Father or Mother. Father has been incarcerated for E.F.'s entire life.

**(3) The parental duties performed by each party on behalf of the child.**

This factor is in Mother's favor. Mother cared for E.F. throughout E.F.'s entire life, as Father has been incarcerated and will not be released from prison until 2024.

**(4) The need for stability and continuity in the child's education, family life and community life.**

Applicable in favor of Mother. E.F. currently resides with Mother. It is nearly impossible for Father to attend to E.F.'s needs, as he is incarcerated. On one occasion when Father had a gap between his incarcerations, he attempted to [visit] the child [at]

a festival, but Mother would not allow Father to take E.F., as Father showed up with an intoxicated friend. Father was irritated and called Mother inappropriate names in front of E.F. Further, Mother states Father surrounds himself with gang members and brags that he is a gang leader. Continuity and stability in E.F.'s life is best achieved by Mother.

**(5) The availability of extended family.**

Father has a mother and a sister[;] however, Mother does not have a good relationship with Father's family. When Father was incarcerated for terroristic threats against Mother, Father's mother and sister called Mother, screaming and threatening her. Mother believed Father's sister wanted to have a physical altercation with Mother.

**(6) The child's sibling relationships.**

Not applicable. There has been no testimony concerning this factor.

**(7) The well-reasoned preference of the child, based on the child's maturity and judgment.**

Not applicable. There has been no testimony from the child concerning this factor.

**(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

Applicable in favor of Mother. Father has spoken negatively about Mother to E.F., saying it was Mother's "fault he couldn't live [with] us or that he couldn't be around."

**(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

The court finds that Mother is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs. Father is currently incarcerated and cannot provide or care for E.F. Further, during a gap between Father's incarceration, Father attempted to take E.F. to a family function in New Jersey, which would have violated his parole. Additionally, Father was reincarcerated in 2019 due to terroristic threats on Mother's life and the life of others around Mother. Moreover, Mother testified that Father talks to E.F. inappropriately, not knowing the difference between a

- 18 -

conversation with an adult versus a child. Father also would make promises to E.F. that Father could not fulfill while incarcerated, [thus] further confusing E.F.

**(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.**

Applicable in favor of Mother, as E.F. resides with Mother and Father is incarcerated until 2024. Father would not be able to attend to E.F.'s daily physical, emotional, developmental, educational and special needs.

**(11) The proximity of the residences of the parties.**

Not applicable. There has been no testimony regarding this factor. Mother's address is confidential [because of the PFA order], and Father is currently incarcerated.

**(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.**

Applicable in favor of Mother as Father is incarcerated and cannot care for E.F. or make any child-care arrangements.

**(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

Applicable in favor of Mother. Father was reincarcerated [in] 2019 due to terroristic threats on Mother's life and the life of others around Mother. Mother has a PFA order against Father, which expires on October 23, 2023. The PFA order has no provision for Father to contact Mother for purposes of custody or E.F.'s well-being. When E.F. talked to Father on the phone or visit[ed] him in prison, Father would only say a few words to E.F., then concentrated on talking to Mother and attempting to convince her to kiss or hug him.

**(14) The history of drug or alcohol abuse of a party or member of a party's household.**

There was some testimony of Mother being on parole for possession of a controlled substance.

**(15) The mental and physical condition of a party or member of a party's household.**

- 19 -

Not applicable. There has been no testimony regarding this factor.

**(16) Any other relevant factor.**

Mother has a PFA order against Father. The PFA order has no provision for Father to contact Mother for purposes of custody or E.F.'s well-being. As such, any contact Father has with Mother, for any reason, could result in a PFA violation, which may add more time to Father's incarceration.

**CONCLUSION:**

The evidence persuades the [trial] court that Mother is currently the parent that can care for E.F., and provide for E.F.'s educational, physical, and emotional needs. Therefore, it is not in E.F.'s best interest to have telephone/video conference calls with Father.

Trial Court Opinion, filed 10/5/21, at 3-7 (bold in original) (citations to record omitted).

We find no abuse of discretion or error of law. **See V.B. v. J.E.B.**, 55 A.3d 1193 (Pa.Super. 2012). The trial court's factual findings are supported by the competent evidence of record, and the trial court's conclusions are reasonable. **See id.**

To the extent Father contends the trial court erred in deeming Mother's testimony to be more credible than his testimony, we note it was properly within the trial court's province to make such a determination. **See R.M.G., Jr.**, **supra**.

Further, to the extent Father contends the trial court did not properly weigh the veracity of Mother's assertions regarding her allegation that Father

physically abused E.F.[4] and/or that she was not convicted of possession of a controlled substance, we note "[t]he parties cannot dictate the amount of weight the trial court places on evidence." **R.M.G., Jr.,** 986 A.2d at 1237 (quotations omitted).

In any event, in considering the factors under Section 5328(a), the trial court found there was no evidence suggesting Father abused E.F., and the trial court acknowledged there was testimony that Mother was on parole for possession of a controlled substance. To the extent Father is asking us to re-weigh the evidence, we decline to do so. **See id.** The paramount concern in this matter was the best interest of E.F., and our interference is unwarranted given the trial court considered the best interest of E.F. in a careful and thorough manner. **See R.M.G., Jr.**, **supra**.

For all of the aforementioned reasons, we affirm the trial court's order denying Father's petition for modification of custody with respect to E.F.

Affirmed.

_____

[4] As indicated *supra*, Mother explained during her testimony that, when Father pushed her onto a bed while she was pregnant with E.F., she believed this constituted physical abuse of E.F. The trial court considered this evidence and found that while Father's actions constituted abuse towards Mother it did not constitute abuse towards E.F. **See** Trial Court Opinion, filed 10/5/21, at 3 (pertaining to factor 2 and 2.1).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/09/2022